Lawrence O'CONNOR, et al., Plaintiffs,

v.

BOEING NORTH AMERICAN, INC. and Rockwell International Corporation, Defendants.

No. CV 97–1554 ABC (RCX).

United States District Court, C.D. California.

March 28, 2000.

A. Barry Cappello, Leila J. Noel, J. Paul Gignac, Kim A. Seefeld, Troy A. Thielemann, Cappello & McCann, Santa Barbara, CA, Tina B. Nieves, Hector Gancedo, Gancedo & Nieves, Pasadena, CA, for plaintiffs.

John Reding, William Schofield, Barry Endick, Paul, Hastings, Janofsky & Walker, San Francisco, CA, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R.CIV.P. 56

COLLINS, District Judge.

Defendants Boeing North American, Inc. and Rockwell International Corporation filed a motion for summary judgment on December 27, 1999. The motion raises the issue of whether most of Plaintiffs' claims are barred because Plaintiffs should have known of their claims outside of the applicable limitations period. After reviewing the materials submitted by the parties, argument of counsel, and the case file, the Court concludes that, as to 69 Plaintiffs asserting personal injury or wrongful death claims, the question of whether they should have known of their claims earlier depends on factors that vary among the Plaintiffs. Accordingly, the Court GRANTS the motion as to certain Plaintiffs and DENIES it as to other Plaintiffs. The Court also concludes that Defendants have failed to meet their initial burden of proof as to the class claims.

Accordingly, the Court DENIES Defendants' motion as to the class claims.

## I. Procedural Background

On March 10, 1997, Plaintiffs filed an initial complaint in this action. The complaint was amended several times. The operative complaint is now the Fourth Amended Complaint ("FoAC") which was filed on March 30, 1998. Plaintiffs consist of 68 individuals and the estates of eleven decedents. These 79 Plaintiffs assert claims on their own behalf.[1] The FoAC also asserts claims on behalf of three classes. The three classes are defined as follows:

> Class I: All persons (1) presently residing or working within the Class Area or who have resided or worked in the Class Area at any time since 1946, and (2) who have not been diagnosed with certain serious illnesses.

> Class II: All persons who own real property located within the Class Area.

> Class III: All persons presently residing or working within the Class Area or who own real property located within the Class Area.

The Class I representatives are Harold Samuels and Joyce Samuels. The Class II and Class III representatives are Lawrence O'Connor, Margaret O'Connor, Mary Jane Vroman, Robert Grandinetti, Donald Reed, and William Rueger. The three classes were conditionally certified on July 13, 1998.

---

1. The eleven estates assert wrongful death claims; 60 individuals assert only personal injury claims; four individuals assert both personal injury and class claims on their own behalf; and four individuals allege only class claims on their own behalf.

2. The Court also notes that various objections to evidence were filed by both sides. The Court reviewed all the objections to the evidence upon which it has relied. To the extent that the Court has relied on that evidence in this order, the objections are OVERRULED on the merits. Objections to evidence upon which the Court does not rely are OVERRULED as moot, except as indicated herein.

The FoAC asserts personal injury or wrongful death claims on behalf of 75 Plaintiffs. The FoAC also asserts medical monitoring claims on behalf of Class I and its class representatives. Various property damage claims are asserted on behalf of Class II and its representatives. Finally, the FoAC asserts a CERCLA claim and a California Unfair Business Practices claim on behalf of Class III and its representatives.

On December 27, 1999, Defendants filed the present motion for summary judgment. Defendants move for summary judgment against:

(1) all Plaintiffs asserting personal injury claims except for Plaintiffs Terri Aungst, LaVerne Barina, Sharon Grandinetti, and Nicky Pelaez;

(2) all Plaintiffs asserting wrongful death claims except for the estate of Eugene Mauck;

(3) all Class I and Class III claims; and

(4) all Class II claims except for the continuing trespass and nuisance claims.

Plaintiffs filed an opposition to the motion on February 14, 2000. On that same date, a stipulation dismissing the claims of Plaintiff Emily Sadjady was entered. Defendants filed a response on February 28, 2000.[2]

## II. Summary Judgment Standard of Review

It is the burden of the party who moves for summary judgment to establish that

---

Moreover, the Court did not consider the additional evidence presented by Defendants concurrently with the Reply brief.

The Court also admonishes the parties for their flagrant violations of Local Rules 3.4.1 and 3.4.7. Counsel should note that ten characters per inch usually means 13–point Times Roman or 13–point Helvetica. Additionally, the Local Rules do not permit the parties to shrink footnote text at all, let alone to the point that a magnifying glass is required. The Local Rules also do not allow parties to runtexttogether. Any future violations of these rules may result in the Court rejecting the document filed.

there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings . . . [T]he adverse party's response . . . *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the non-moving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505.

### III. Factual Background[3]

### A. The Present Lawsuit.

#### 1. *The Plaintiffs in this action.*

The initial complaint in this action was filed on March 10, 1997. (Pls.' Stmnt. of Gen. Issues In Opp. ("Facts") ¶ 1.) In addition to the plaintiff classes, four individual plaintiffs joined the initial complaint: Mary Christine Crilley, Kathy Hecker, L. O'Connor, and Nicky Pelaez. (*Id.* at ¶ 9a.) Plaintiffs M. O'Connor and Vroman were also class representatives in the original complaint. (*See* Original Complaint.)

A First Amended Complaint was filed on May 8, 1997. A Second Amended Complaint followed on June 27, 1997. (Facts ¶ 1.) The following Plaintiffs joined the case with the Second Amended Complaint: Carmela Anzilotti, Faith Arnold, Lila Arnold, the Estate of Edward J. Barina, Laverne F. Barina, Linda Blaustein, Howard Bleecker, Melissa Bolster, Ashlie Bryant, Jennifer Cady, Heather Cass, Briana Alys Chappell, Mark Davis, Madeline Felkins, Sharon Grandinetti, Robert Grandinetti, Norman Gross, Mary McKeever Hellerstein, Susan Hemming, Julie King, Margaret Kirby, Joy E. Lee, Helen Pasquini, Laurel Peyton, Rosemary Pitts, Donald Reed, Emanuel Rubin, William Rueger, Pauline Sablow, Harriet Spero, Donna Stone, Jerry Stone, Mildred Strausburg,

---

**3.** As required for purposes of a summary judgment motion, this section views the evidence in the light most favorable to Plaintiffs.

Jacqueline Teicher, Miles Teicher, Ralph Tremonti, Jr., and Victor Wollman.

A Third Amended Complaint was filed on December 22, 1997. (Facts ¶ 1.) The following Plaintiffs joined the case with the Third Amended Complaint: Terri Aungst, Kathleen Brucato, Gerald Creinin, Ruby Diamond, Louise Marjorie Extract, Roy Fischman, Grace Highfield, Miriam Hintz, the estate of Jason Hudlett, the estate of Bernard Hudson, Heather Hultgren, Patricia Lev, Joan Mann, the estate of Eugene Mauck, Shirley Orban, the estate of Marrilee Fay Reed, Marion Rosen, Denise Seth–Hunter, Jody Smith, Maralyn Soifer, the estate of Marjorie Taaffe, the estate of Ralph Tremonti, Sr., the estate of Robin Lynn Trench, Randall Trench, Don Varley, Cheryl Wernke, Helen White, Carol Wolfsen, and Stephanie Zakarian.

The FoAC was filed on March 30, 1998. (Facts ¶ 1.) The following Plaintiffs joined the case with the FoAC: the estate of Archibald Cameron, the estate of Hai–Chou Chu, Carlene Getter, Emily Sadjady, and the estate of Paula Jean Trevino. Plaintiffs Harold and Joyce Samuels also joined the FoAC as class representatives.

### 2. The FoAC's allegations.

Plaintiffs' action is based on activities conducted by the Defendants at the Santa Susana Field Laboratory ("SSFL"), the Canoga Facility, the DeSoto facility, and the Hughes facility (collectively, the "Rocketdyne facilities").[4] (Facts ¶ 2.) Plaintiffs allege that Defendants' activities over the last fifty years at the Rocketdyne facilities have resulted in the release of radioactive contaminants and hazardous non-radioactive contaminants into the environment, the air, the soil, and the groundwater. (Id. at ¶¶ 3 & 4.)

The FoAC identifies certain specific releases of radioactive and hazardous substances from the Rocketdyne facilities. The FoAC alleges that radiation was released into the groundwater, surface waters, soil and air from the 1959 nuclear meltdown and from SSFL water leaks during the 1960's and 1970's. (Facts ¶¶ 12a & 12b.) The FoAC also alleges that (1) TCE was released into the ground at SSFL between 1953 and 1961, (Id. at ¶ 12c), (2) monomethyl hydrazine was regularly vented from SSFL in the late 1980's and early 1990's, (Id. at ¶ 12f), and (3) Defendants treated, stored, and disposed of hazardous waste in violation of applicable safety laws until at least July 24, 1994. (Id. at ¶ 12k).

According to Plaintiffs, Defendants' release of pollutants has (1) contaminated the property of the facilities' neighbors, (2) significantly increased the neighbors' exposure to radioactive and hazardous substances, and (3) caused injuries, death, and a significantly increased risk of disease. (Facts ¶¶ 5 & 6.) All but four of the individual plaintiffs claiming personal injury were diagnosed with a serious illness alleged to have been caused by Defendants' contamination more than a year before the Plaintiff joined the lawsuit.[5] (Id. ¶ 10.) All but one of the deaths alleged to have been caused by Defendants' contamination occurred more than a year before the respective decedents' estates joined the lawsuit.[6] (Id.)

Plaintiffs allege that they did not discover the cause of their respective injuries until UCLA released a study concluding that workers at SSFL had an increased risk of contracting cancer due to exposure to radioactive contamination at the facility. (FoAC ¶ 189.) The UCLA study was released on September 11, 1997, after the Second Amended Complaint and before the Third Amended Complaint. (Id.)

4. SSFL is located in Eastern Ventura County and the remaining three facilities are located in Canoga Park, which is in the San Fernando Valley. (Facts ¶ 2.)

5. The four Plaintiffs who joined the lawsuit within a year of their respective diagnosis were: Aungst, L. Barina, S. Grandinetti, and Pelaez. (Facts ¶ 10.)

6. The one Plaintiff-decedent's estate that joined the lawsuit within a year of the death is the estate of Mauck.

## B. Publicity of Rocketdyne Activities.

### 1. Public Discourse from 1976 to 1986.

Starting in the late 1970's, the media began to cover Defendants' operations at the Rocketdyne facilities and its effect on the environment. The media reports focused on a nuclear meltdown that occurred at SSFL in 1959.[7] The brunt of the publicity occurred from June 1979 to September 1980. During that period of time, the local NBC affiliate ran a five-part, week-long series about the 1959 meltdown, (Facts ¶ 22), and fourteen articles were run in Southern California newspapers about the 1959 nuclear meltdown,[8] (Remley Decl. ¶ 11).

These media reports resulted in various governmental hearings and meetings. (*See* Facts ¶¶ 23 & 27.) In turn, some of these hearings were reported in newspapers, including the *Los Angeles Times*. (Remley Decl. ¶ 16.) One of these hearings held by the Ventura Board of Supervisors was attended by over 200 residents and by the Committee to Bridge the Gap ("CBG"), a community group concerned about the nuclear operations at the Rocketdyne facilities. At this hearing in January 1980, CBG distributed a memorandum, entitled *Past Accidents and Areas of Possible Present Concern Regarding Atomics International* ("*Past Accidents*"), which described the 1959 meltdown and ten other accidents at the Rocketdyne facilities.[9] (*Id.*)

In 1982, Rocketdyne applied to renew its license, issued by the United States, to handle special nuclear materials at the Rocketdyne facilities. More than 700 residents submitted postcards and letters in opposition. (Facts ¶ 28.) The postcards stated, "My health, safety, welfare, and financial and emotional well-being are directly threatened by the presence of these highly dangerous nuclear materials in my community." (Remley Decl.Ex. I.) From February 1982 to June 10, 1983, the *Los Angeles Times* printed six articles on these proceedings. (*Id.* at ¶ 19.) The *Simi Valley Enterprise* printed two. (*Id.*) Sporadic reports concerning the 1959 nuclear meltdown and the ten accidents described in *Past Accidents* continued through September 1986. (*See* Remley Decl.Ex. J.)

### 2. Public Discourse from 1989 to 1996.

In February 1989, the United States Department of Energy ("DOE") issued a report of preliminary findings of the environmental effect of DOE activities at SSFL. The report noted that there were "ten areas of 'actual and potential sources of soil and/or groundwater contamination' of 'hazardous and/or radioactive substances.'" (Facts ¶ 29.) The report also stated that the "full nature and extent of contamination is not known" and that the "extent of groundwater contamination [or] offsite groundwater contamination" could

---

7. Most of these reports appeared in the following newspapers: the *San Fernando Valley News*, the *San Fernando Valley View*, the *Simi Valley Enterprise*, the *Simi Valley Star*, the *Valley News*, the *Topanga Messenger*, and the *Thousand Oaks News Chronicle*. Collectively, these newspapers will be referred to as the "Valley Papers."

8. Of these, five articles were printed in the Valley Papers; one in the *Los Angeles Times;* one in the now-defunct *Herald Examiner;* and six in the *Ventura Star–Free Press*, the *Oxnard Press Courier*, or the *This Week* (collectively, the "Ventura Papers"). (Remley Decl. ¶ 11.)

9. The Court notes that Defendants assert that *Past Accidents* "has been widely circulated in

public forums after its initial appearance." (Facts ¶ 26.) To support this proposition, Defendants cite to four additional exhibits that comprise over 200 pages. (*See* Tittmann Decl.Exs. D, G, H, J.) The Court notes that, even if in these documents one could find support for the "widely circulated" proposition, Defendants have failed to meet their burden to "identify that issue and *support* it with evidentiary materials, without the assistance of the district court judge." *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir.1988) (emphasis added) (holding that district court need not search through a voluminous record in the hope of locating and identifying support for a party's position.)

not be determined.[10] (*Id.* (quoting report).)

On Sunday May, 14, 1989, the *Los Angeles Daily News* published a front-page article concerning the 1989 DOE report and contamination at SSFL. (*See* Facts ¶ 30; Circle Decl.Ex. B.) The article stated that a private consultant who was part of the survey team that authored the report said that "[t]here was no immediate threat to public safety." (Circle Decl.Ex. B.) The article also credited Rocketdyne with statements that there was "no present threat to human life" and that Rocketdyne would take all necessary steps to maintain a safe environment. (*Id.*) At the same time, the article clearly supports its headline: "Rockwell site contaminated: Radiation taints Santa Susana lab's soil and water." (*See id.*)

The Valley Papers also picked up the *Daily News* story and printed over fifteen articles between May 14 and May 31, 1989. (*See* Circle Decl.Ex. D. at 71–180.) During that same period of time, the *Los Angeles Times* also printed three articles on the topic. However, these articles were all printed in the inside pages of Section II of the paper. (*See id.*)

The *Daily News* also continued printing articles on the topic. Between May 16 and June 2, 1989, the *Daily News* printed a front-page article almost daily and would consistently print a second or third article on the topic in the inside pages.[11] (*Id.*) Moreover, although some of the Valley Papers' and *Los Angeles Times'* article headlines would not necessarily provide clues to a reader that the article was about the Rocketdyne facilities or contamination in the Valley, almost all the *Daily News'* headlines indicated that the articles concerned Rocketdyne or Valley contamination.[12] (*Id.*)

During the same month, Rocketdyne again applied to renew its license to handle nuclear materials. A petition signed by 650 persons, however, was filed with the United States Nuclear Regulatory Commission ("NRC") in opposition to the renewal of Rocketdyne's license. The petition stated that Rocketdyne's nuclear operations "threaten the health and safety of over half a million people in the surrounding communities." (Facts ¶ 35.) As a result of the opposition, the NRC held hearings on Rocketdyne's application between May 1989 and April 1990. These hearings were attended by several hundred community members and several community groups and individuals submitted evidence in opposition to the relicensing. (*Id.*) For instance, CBG filed a memorandum in opposition based primarily on *Past Accidents*.[13] (Rutherford Decl. ¶ 13.)

In June 1989, a task force called the SSFL Work Group was created. The SSFL Work Group included representatives from federal, state, and local agencies with jurisdiction over SSFL along with community representatives. The purpose of the SSFL Work Group was to facilitate the inter-agency sharing of information about environmental issues related to SSFL. The SSFL Work Group has held quarterly, public meetings since December 1989 for the purpose of investigating and discussing environmental issues related to SSFL. (Facts ¶ 32.) The meetings have been attended by community members and

---

**10.** Plaintiffs assert that the report concluded that there was no immediate threat to the public. (Facts ¶ 29.) However, to support this proposition, they cite to the full 232–page report. By so doing, Plaintiffs fail to support their factual conclusion. *See Nilsson*, 854 F.2d at 1545.

**11.** *Daily News* front page articles appeared on May 16, 17, 19 – 21, 23 – 29, and 31, and on June 1 and 2. More than one article was printed on May 16, 17, 21, 27, 24, 25, 31, and June 1 and 2.

**12.** Defendants assert that the television and radio broadcast media aired segments on the DOE report. (Facts ¶ 31.) However, Defendants present no admissible evidence to support this contention. *See infra* note 16.

**13.** Defendants assert that "[t]he hearing and the adverse evidence concerning Rocketdyne's operations were widely reported in the news." (Facts ¶ 35.) However, they fail to identify the evidence supporting this statement.

media reporters from the Valley Papers, the *Daily News*, and the *Los Angeles Times*. (Lafflam Decl. ¶ 13.) The SSFL Work Group meetings and the issues discussed were reported by the news media. (Facts ¶ 32.)

In October 1990, the California Department of Health Services ("DHS") published a study suggesting a possible connection between Rocketdyne facilities and increased cancer in the surrounding communities. The study was distributed and discussed at an SSFL Work Group meeting in February 1991. That meeting was attended by dozens of residents. (Facts ¶ 36.) The study was also the topic of a public legislative hearing and of various newspaper articles from February 3, 1991 to February 9, 1991. (*Id.*) These articles included six articles in the Valley Papers, four articles in the inside pages of section II of the *Los Angeles Times*, and two front-page articles on the *Daily News*. The headline of one of the *Daily News'* articles read: "Rise in Bladder Cancer Seen Near Rockwell Site." (Circle Decl.Ex. D at 807.)

In August 1991, Rocketdyne discovered trace amounts of radionuclide tritium in a groundwater well offsite from SSFL. This finding was reported at the September 1991 SSFL Work Group meeting. (Facts ¶ 37.) On August 2, 1991, the *Daily News* ran a front-page article about this discovery with the headline: "Toxic plume detected in ground water leaving Rockwell lab." (Circle Decl.Ex. D at 940.) On August 31, the *Daily News* followed up with

another front page article declaring in its headline: "Contamination found outside Rockwell lab." (*Id.* at 947.) The *Los Angeles Times* also printed a story in the inside pages of Section II on August 2, (*Id.* at 939), and the *Simi Valley Enterprise* printed an article about off-site contamination on August 31, 1991, (*Id.* at 949).

In March 1992 and in March 1994, an independent environmental company conducted testing of soil, surface water, groundwater, and fruit samples for chemical and radioactive contamination. Regulatory agencies participated in the testing, and the project was overseen by the SSFL Work Group.[14] (Facts ¶ 38.)

During this period of time, several community organizations were formed for the purpose of investigating contamination migrating from the Rocketdyne facilities. (Facts ¶ 33.) The issue of contamination from the Rocketdyne facilities has been addressed at over 100 public meetings between 1989 and 1996.[15] (*Id.* ¶ 34.) For instance, following the May 1989 articles, the Rocketdyne facilities' contamination of its neighbors became a principal topic of discussion at the Santa Susana Knolls Homeowners Association's twice-monthly meetings. (Varley Depo. at 23–24, 48.)

According to Defendants, just under 1,000 articles or news segments about the Rocketdyne facilities' operations were disseminated between 1989 and 1997, inclusive. (Circle Decl. ¶¶ 5, 6 & Ex. E.) Just under 400 of those articles were published in 1989 with close to 200 articles printed in May and June of that year.[16] (*Id.*, Ex. E.)

---

14. Defendants assert that "[t]he testing and its results was reported widely in the news media." (Facts ¶ 38.) However, they fail to identify the evidence supporting this statement. Additionally, to the extent that it could rely upon Lafflam's statement that Barbara Johnson made statements to Channel 13, the Court finds that Lafflam fails to indicate how he acquired that knowledge. (*See* Lafflam Decl. at 12:13–15.) Accordingly, the Court SUSTAINS Plaintiffs' objection to that statement.

15. Defendants assert that "[t]hese meetings were also reported in the news media."

(Facts ¶ 34.) However, they fail to identify the evidence supporting this statement.

16. Defendants provide the Court with 1,307 pages of newspaper articles and reports from media reporting services concerning the broadcast media in apparent chronological order. (Circle Decl.Ex. D.) The Court notes that the first 110 pages of the exhibit contain the May 1989 articles described in the text of this order.

Plaintiffs assert hearsay objections to the material submitted by Defendants. As to the newspaper articles, Defendants are merely introducing the articles to show the fact of publicity, not to establish the truth of the

Defendants assert that the articles relate to the potential health impact of the Rocketdyne facilities' operations. (Circle Decl. ¶ 5.) However, with the exception of articles specifically discussed in this fact section, Defendants fail to point to specific articles that discuss the health impact of the facilities' operations. Although Defendants do not point to any specific documents, the Court has reviewed some of the articles presented in the voluminous 1,307-page exhibit containing the media reports.[17] Although clearly some of these

articles. Accordingly, as to the newspaper articles, the objection is OVERRULED. However, as to the broadcast media reports, the reports are not merely offered to show that Rocketdyne received a report. Instead, they are being offered for the truth of the matter asserted in the document: that a radio or television station broadcast the report therein indicated. Nothing in the declaration of Lori Circle demonstrates that a hearsay exception applies. Accordingly, the Court SUSTAINS the objections to the broadcast media reports.

17. The headlines provide a flavor of the variety of articles presented by Defendants:

1. "Rockwell seeking nuclear contracts", *Los Angeles Daily News*, June 5, 1989—front-page article stating, among other things, that community representatives were concerned about the lack of communication about the extent of contamination, (Lori Decl.Ex. D at 199);

2. "Workers were overexposed at Rockwell", *Los Angeles Daily News*, June 16, 1989—front-page article about radioactive exposure of workers in 1960's and stating that 1989 DOE report concluded that there was no immediate harm to public health, (*id.* at 251–52);

3. "Rockwell site being reassessed: EPA to determine Superfund priority", *Los Angeles Daily News*, June 29, 1989—front-page article stating that DOE report heightened concerns about toxic and radioactive contamination, (*id.* at 298–99);

4. "EPA Reports No Imminent Hazards at Rockwell Lab", *Los Angeles Times*, August 2, 1989—article on page 8 in section II of San Fernando Valley Edition, (*id.* at 350–51);

5. "EPA doubts Rockwell data: Calls Santa Susana lab monitoring inadequate to assure safety," *Los Angeles Daily News*, August 31, 1989—front-page article, (*id.* at 400–02);

6. "Rockwell sues, claims DOE, EPA in conflict", *Los Angeles Daily News*, September 22, 1989—front-page article about Colorado facility that mentions DOE Report, (*id.* at 450.);

7. "Hearing Today on Rockwell Cleanup", *Los Angeles Times*, October 16, 1989—article on page 4 in section II of San Fernando Valley Edition, (*id.* at 500);

8. "Activists rally in Simi Hills: Seek promise to end nuclear work at site", *Los Angeles Daily News*, October 27, 1989—page 2 article

about NRC license that mentions DOE report, (*id.* at 551–52);

9. "No Risks Found at Rockwell Lab but More Tests Sought: Radiation Testing: An EPA report on checks made in July at the Santa Susana site discloses that only six samples were taken at the 290–acre site", *Los Angeles Times*, November 29, 1989—article on page 3 in section II of San Fernando Valley Edition, (*id.* at 600);

10. " 'Hot Lab' Will Shut Down Next Year, Rockwell Says: Rocketdyne: The last active nuclear facility in the Santa Susana Field Laboratory will close after a final experiment, officials say", *Los Angeles Times*, December 19, 1989—article on page 3 in section II of San Fernando Valley Edition, (*id.* at 649–50);

11. " 'Hot lab' opponents file cases with NRC", *Simi Valley Enterprise*, February 21, 1990, (*id.* at 699–700);

12. "Field Lab draws new protests", *Simi Valley Enterprise*, July 4, 1990, (*id.* at 750);

13. "Visitors Enjoy Rocketdyne's Red Glare", *Los Angeles Times*, January 20, 1991—article on page 20, (*id.* at 800);

14. "Lawmakers seek access to Rockwell health files", *Los Angeles Daily News*, February 9, 1991—front-page article about exposure of workers that also mentions concerns about neighbors' health and safety, (*id.* at 852);

15. "EPA details problems at Field Lab", *The Enterprise*, March 20, 1991, (*id.* at 899–900);

16. "Radioactive Pollution Discovered in Test Well: Rockwell: Tritium seeped into ground water near the Simi Hills lab, but at safe levels, company officials say", *Los Angeles Times*, August 31, 1991—article on page 11 in section II, (*id.* at 950);

17. "20 Firms Assailed for Ozone Depletion", *Los Angeles Times*, June 29, 1992—article on page 3 in section I, (*id.* at 1001);

18. "Rockwell to pay $650,000 in fines", *Los Angeles Daily News*, December 3, 1992, page 3 article, (*id.* at 1050);

19. "Rockwell Lab Waste Cleanup Discussed", *Los Angeles Times*, July 20, 1993—article on page 4 in section II, (*id.* at 1100);

20. "Dispute Surfaces on Rocketdyne Deaths Study: Health: Watchdog panel questions research as investigators say they will soon know how many died from radiation", *Los Angeles Times*, July 11, 1995—no starting page indicated, (*id.* at 1150); and

articles address the potential health impact of the Rocketdyne facilities' operations, many of them address different aspects of the Rockwell facilities' operations. Additionally, most of the articles addressing the health impact of the operations focus on the impact on Rocketdyne workers.

Plaintiffs point out that the articles were published in sixteen different newspapers: *Los Angeles Times, Los Angeles Daily News, Herald Examiner,* the seven Valley Papers, the three Ventura Papers, the *Enterprise Sun & News,* the *Sacramento Bee,* and the *Orange County Register.* (Daniels Decl. ¶ 7.) With the exception of the *Sacramento Bee,* these papers target particular communities within the counties of Ventura, Orange, and Los Angeles.

The circulation of those newspapers varied. Between 1990 and 1994, the circulation of the *Los Angeles Times* fluctuated. However, it was approximately a million for the weekday editions and around a million and a half for the Sunday edition. (Bellows Decl. at 4.) The *Los Angeles Daily News* circulation never exceeded 230,000 between 1990 and 1994. (*Id.*) The *Daily News* circulates primarily within the San Fernando and Simi Valleys. (Circle Decl. ¶ 4.) With two exceptions, it appears that the Valley Papers and the Ventura Papers did not exceed an average circulation of 25,000. (Bellows Decl. at 6–9.) The two exceptions are the *San Fernando Valley News* and the *Ventura County Free Press* with circulations of about 40,000 and 50,000 respectively. (*Id.* at 5.) Neither side presents any evidence concerning the circulation of the *Sacramento Bee* or the *Orange County Register* in Los Angeles or Ventura County.

### 3. Defendants' Public Outreach.

Since 1989, Rocketdyne has sponsored dozens of public meetings with interested citizens, community groups, legislative representatives, regulators, and news report-

ers in an effort to respond to the concerns about the health and safety impacts of the Rocketdyne facilities.[18] (Facts ¶ 40.) Rocketdyne and the EPA also maintain a mailing list of persons interested in issues of potential contamination from Rocketdyne facilities. These persons are provided with periodic reports concerning environmental issues at the facilities. (Facts ¶ 42.)

Additionally, Rocketdyne has provided bus tours of SSFL. (Facts ¶ 41.) The tour transcript describes seven areas of contamination at SSFL. (Circle Decl. ¶ 7a.) However, the Court finds that there is a genuine issue of fact as to whether a person would reasonably suspect that the identified contamination would have impacted either SSFL's neighbors or workers after taking the bus tour. (*See* Circle Decl.Ex. F (tour transcript).)

Beginning in early 1990, Rocketdyne also established document repositories in public libraries in Simi Valley, California State University Northridge, and West Hills. Rocketdyne has sent copies of every significant environmental report concerning SSFL's operations to each library on a regular basis since the repositories were established. (Facts ¶ 39.)

### 4. Litigation Alleging Contamination.

Defendants also identify seven cases that have been filed against them since 1981 alleging that the Rocketdyne facilities have contaminated the neighboring communities. These cases have been filed in the Central District of California, the Ventura County Superior Court, and the Los Angeles County Superior Court. One of these cases, *Varley v. Rockwell,* was filed in 1989 by Plaintiff Varley. *Varley* alleged that Rocketdyne's emissions of fumes and gases of toxic compounds caused Plaintiff's lymph cancer. (Facts ¶ 43b.)

---

21. "Radioactive steel shipped to wrong processing plant", *Simi Valley Star,* November 8, 1995, (*id.* at 1204).

**18.** Defendants assert that "[t]hese meetings have been reported in the news media." (Facts ¶ 40.) However, they fail to identify the evidence supporting this statement.

## IV. Analysis

### A. The Statute of Limitations and the Discovery Rule.

" 'Statute of limitations' is the collective term commonly applied to a great number of acts, or parts of acts, that prescribe the periods beyond which a plaintiff may not bring a cause of action." *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 395, 87 Cal. Rptr.2d 453, 981 P.2d 79 (1999). Under the statute of limitations, a plaintiff must bring a cause of action within the applicable limitations period after accrual of the cause of action. *Id.* at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79. Claims brought after the expiration of the limitations period are generally barred.

■ A claim accrues upon the occurrence of the last element necessary to complete the claim. *Id.* The claim accrues under this traditional rule "even if the plaintiff is unaware of [the] cause of action." *Mangini v. Aerojet–General Corp.*, 230 Cal.App.3d 1125, 1149–50, 281 Cal. Rptr. 827 (1991).

■ An exception to the traditional rule of accrual is the discovery rule. *Norgart*, 21 Cal.4th at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79. The discovery rule postpones accrual of a claim until "plaintiff discovers, or has reason to discover, the cause of action." *Id.* A plaintiff discovers the claim when he or she at least suspects an injury that was caused by wrongdoing. *Id.; Jolly v. Eli Lilly Co.*, 44 Cal.3d 1103, 1109–11, 245 Cal.Rptr. 658, 751 P.2d 923 (1988). In this context, "wrongdoing" does not have any technical definition but is merely used in accordance with its "lay understanding." *Jolly*, 44 Cal.3d at 1110, n. 7, 245 Cal.Rptr. 658, 751 P.2d 923.

■ A plaintiff is "held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." *Id.* at 1109, 245 Cal.Rptr. 658, 751 P.2d 923. A person has reason to suspect an injury and wrongdoing where he or she has "notice or information of circumstances to put a reasonable person *on inquiry*." *Id.* at 1110–11, 245 Cal.Rptr. 658, 751 P.2d 923 (internal quotations omitted; emphasis in original). "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim." *Id.* at 1111, 245 Cal.Rptr. 658, 751 P.2d 923. "So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *Id.*[19]

19. Plaintiffs argue that the CERCLA discovery rule preempts California's discovery rule under 42 U.S.C. § 9658(a). Under that section, State law is preempted *only* if the accrual date under state law would be earlier than the accrual date under federal law. *Id.* If the CERCLA limitations period were to apply, a claim would have accrued when a plaintiff "reasonably should have known" about the injury and its cause. *See* 42 U.S.C. § 9658(b)(4)(A). Plaintiffs assert that "reasonably should have known" is a different standard than "reasonably should have suspected." The standard, however, is generally not different.

CERCLA's statute of limitations sought to "create[ ] a federally mandated discovery rule." *Angeles Chemical Co. v. Spencer & Jones*, 44 Cal.App.4th 112, 123, 51 Cal. Rptr.2d 594 (1996) (quoting *Bolin v. Cessna Aircraft Co.*, 759 F.Supp. 692, 704 (D.Kan. 1991)). The purpose of the discovery rule is to ameliorate the harshness of the traditional accrual rule for those individuals who are in ignorance of a claim. 3 Witkin Cal.Proc. *Actions* § 462 (4th ed.1996). However, the discovery rule is not a doctrine that permits a prospective plaintiff to sit on his or her rights. Therefore, suspicion is the standard under the discovery rule. A person reasonably knows about an injury and its cause when he or she at least reasonably suspects an injury and its cause. To hold otherwise would equate knowledge with the acquisition, or possible acquisition, of sufficient evidence to succeed on the claim. Generally, that acquisition would not happen prior to the filing of the claim. *Cf. Jolly*, 44 Cal.3d at 1111, 245 Cal. Rptr. 658, 751 P.2d 923 (noting that the acquisition of specific "facts" necessary to establish a claim is a process contemplated by pre-trial discovery).

Accordingly, the Court finds that CERCLA discovery rule does not preempt the California discovery rule because the accrual date would be the same under either rule. *See* 42 U.S.C. § 9658(a).

### 1. Applicable Limitations Periods.

Defendants assert that three different limitations periods apply in this case:

1) One year for the medical monitoring, personal injury, and wrongful death claims;

2) Three years for the all the property damage claims, including the CERCLA claims; and

3) Four years for the unfair business practices claim. Plaintiffs do not dispute that these are the applicable limitations periods. Accordingly, the Court adopts these limitations periods.

### 2. Burden of Proof.

The parties, however, disagree as to the burden of proof on the statute of limitations issue. Defendants contend that Plaintiffs have the burden of showing accrual under the discovery rule. Plaintiffs contend that Defendants have the burden of showing that accrual, whether by the traditional rule or otherwise, occurred outside the limitations period because the statute of limitations is an affirmative defense.

Generally, Defendants have the burden of proof on affirmative defenses. Thus, "[a] defendant raising the statute of limitations as an affirmative defense has the burden of proving the action is time barred." *California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir.1995). The defendant has the burden of proving that the alleged wrongdoing and the harm occurred outside the limitations period. *Id.*

The discovery rule, however, is an exception to the running of the traditional statute of limitations. *Id.* at 1406–07. Accordingly, once a defendant shows that the action is barred under the traditional rule, a plaintiff has the burden of showing that "he was not negligent in failing to make the discovery sooner and that he had no

actual or presumptive knowledge of facts sufficient to put him on inquiry." *Galen v. Mobil Oil Corp.*, 922 F.Supp. 318, 322 (C.D.Cal.1996) (quoting *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 437, 159 P.2d 958 (1945)); *see also McKelvey v. Boeing North American, Inc.*, 74 Cal.App.4th 151, 160, n. 11, 86 Cal.Rptr.2d 645 (1999); *April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 805, 833, 195 Cal.Rptr. 421 (1983); *Samuels v. Mix*, 22 Cal.4th 1, 10, 91 Cal.Rptr.2d 273, 989 P.2d 701 (1999). Accordingly, under California law, a plaintiff has the burden of showing that the discovery rule applies to a claim.

Plaintiffs' contention to the contrary is without merit. Most of the authorities presented by Plaintiffs do not address California's statute of limitations. The one California case cited by Plaintiffs, *Samuels,* acknowledges that the burden of proof on the discovery rule falls on the plaintiff. *See Samuels*, 22 Cal.4th at 10, 91 Cal. Rptr.2d 273, 989 P.2d 701. Although the *Samuels* Court did place on the defendant the burden of showing that plaintiff discovered a legal malpractice claim outside of the limitations period, it did so because of the unique limitations statute applicable to legal malpractice claims. *Id.* at 10, 91 Cal.Rptr.2d 273, 989 P.2d 701. The applicable statute of limitations in *Samuels,* Cal.Civ.Proc.Code § 340.6, provides that an action for legal malpractice should be commenced "within one year after the plaintiff discovers, or [should have discovered], the facts constituting the wrongful act . . ., or four years from the date of the wrongful act . . ., whichever occurs first." CalCiv.Proc.Code § 340.6(a). Thus, "unlike the discovery rule, which runs in favor of the plaintiff by enlarging his or her time without a set limit, the alternate limitation of section 340.6(a) runs in favor of the defendant by cutting off the plaintiff's time definitively." *Samuels*, 22 Cal.4th at 10, 91 Cal.Rptr.2d 273, 989 P.2d 701. Accordingly, the burden of proof announced by *Samuels* applies only to § 340.6 and not to the discovery rule in general.[20]

---

**20.** Plaintiffs' reliance on *Washington v. Baenziger,* 673 F.Supp. 1478 (N.D.Cal.1987), is also misplaced. *Washington* merely reiterates

a defendant's burden on a summary judgment motion: to show no genuine issue of material fact. *See id.* at 1485.

Finally, Plaintiffs also argue that for the federal claims, federal law determines the issue of accrual. Even assuming that Plaintiffs are right,[21] the Court finds that the burden of proof would be no different. *See Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir.1978) (holding that plaintiff has burden of proof on fraudulent concealment and discovery rule in securities case), *and cases cited therein.*

## B. Personal Injury and Wrongful Death Claims.

### 1. Application of the Traditional Rule.

■ Defendants have the burden of proving that Plaintiffs' claims are time barred under the traditional rule. *See California Sansome*, 55 F.3d at 1406. Thus, to succeed on this motion, they must initially show that no reasonable trier of fact could find other than for Defendants under the traditional rule of accrual.

Based on the nature of the tort alleged by Plaintiffs, the Court finds that accrual of each of the personal injury claims occurred on the date that each Plaintiff was diagnosed with the allegedly resulting illness. *See id.* The Court also finds that the date of accrual on each wrongful death claim was the date of death. *See Norgart*, 21 Cal.4th at 404, 87 Cal.Rptr.2d 453, 981 P.2d 79.

The evidence presented by the parties supports Defendants' contention that all of the personal injury Plaintiffs against whom they seek relief were diagnosed outside of the limitations period except for: L. O'Connor, Reed, and Wolfsen. Defendants fail to provide a diagnoses date for any of these three Plaintiffs. Additionally, it appears that Wolfsen was diagnosed with her illness within the limitations period. (*See* Wolfsen Decl. ¶ 5.) Accordingly,

Defendants' motion as to the personal injury claims of L. O'Connor, Reed, and Wolfsen is DENIED.

Plaintiffs also assert that Hecker and Hellerstein were diagnosed within the limitations period. However, Hecker asserted in the FoAC that she underwent a hysterectomy because of an abnormal deterioration of her uterus in 1983. (FoAC ¶ 38.) Nowhere in her declaration does she state that she now believes that the injury to her uterus was not caused by Defendants' actions. Thus, Defendants satisfy their burden as to Hecker's claim.

Hellerstein's claim is different. First, Hellerstein alleges only that she is suffering from Groves' disease. (FoAC ¶ 39.) Second, she was diagnosed with the disease, at the earliest, on October 24, 1996. (Noel Decl. ¶ 4; Hellerstein Decl. ¶ 5.) Because she joined the case on June 27, 1997, she asserted the claim within the limitations period. Defendants counter that she was diagnosed with "hypothyroidism" in February 1995. (*See* Tittman Decl.Ex. B.)[22] Defendants' evidence, however, does not show that there is no genuine issue of material fact. To find that the accrual period commenced in 1995, a trier of fact would need to conclude that the hypothyroidism was caused by Defendants' contamination. Defendants present no evidence linking that disease to its contamination and Hellerstein is not seeking relief for that injury. Thus, the Court finds that Defendants failed to show that Hellerstein's claim accrued outside the limitations period. Defendants' motion as to Hellerstein's claim is DENIED.

The evidence presented by the parties support Defendants' contention that all of the wrongful death claims on which they seek relief are based on deaths that occurred outside of the limitations period.

---

21. *But see Cook v. Rockwell International Corp.*, 755 F.Supp. 1468, 1482 (D.Colo.1991) (noting that Price Anderson mandates application of state substantive rights, which include the statute of limitations).

22. Plaintiffs' objection to this exhibit, a chart summarizing information on all personal injury plaintiffs, is OVERRULED. Plaintiffs do not contest the accuracy of the information about Hellerstein's claim. Accordingly, the Court finds that the chart is admissible under FRE 1006.

Accordingly, Defendants satisfy their burden of showing that the traditional limitations rule bars all of the wrongful death claims and most of the personal injury claims at issue.

### 2. Application of the Discovery Rule.

■ On those claims which Defendants have shown are barred under the traditional rule of accrual, the burden shifts to Plaintiffs to show that their claims are timely under the discovery rule. To successfully rely on the discovery rule, a plaintiff must prove "(a) lack of knowledge; (b) lack of a means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date); [and] (c) how and when he did actually discover the [claim]." *McKelvey,* 74 Cal.App.4th at 160, n. 11, 86 Cal. Rptr.2d 645 (quoting 3 Witkin Cal. Procedure *Actions* § 602 (4th ed.1996)).

Defendants argue that, because of intense media scrutiny of their operations, Plaintiffs had constructive notice of their claims at a time such that the discovery rule cannot save their claims. Additionally, Defendants point to a lack of evidence to support Plaintiffs' claims of lack of knowledge, their delayed discovery, and a lack of a means of knowledge. (Defs.' Mot. at 40–43.) Accordingly, Plaintiffs have the burden of showing that there are sufficient facts to establish the essential elements of the discovery rule. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

#### a. Lack of knowledge.

To invoke the discovery rule, a plaintiff must prove that he or she was not actually aware of his or her injury and its cause at a time such that the statute of limitations would bar the claim. *See Jolly,* 44 Cal.3d at 1110, 245 Cal.Rptr. 658, 751 P.2d 923. A person is aware of the injury and its

cause where that person knows or suspects both the injury and its cause. *Id.* at 1109–11, 245 Cal.Rptr. 658, 751 P.2d 923; *Norgart,* 21 Cal.4th at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79. Plaintiffs knew of their respective injuries on the date of diagnosis or death, as applicable. The issue here is whether they knew or suspected the cause of the injury or death.

With the exception of Plaintiffs Davis and Bleecker, each Plaintiff filed a declaration stating that he or she did not actually know that Defendants' contamination was the cause of his or her injury until some date within the limitations period. Plaintiff Bleecker died on January 1998.[23] (J. Bleecker Decl. ¶ 5.) His spouse, as the representative of his estate, filed a declaration in opposition to Defendants' motion. However, the declaration does not provide any evidence as to whether Bleecker, the decedent, lacked knowledge of his claim or of when Bleecker actually discovered his claim.

With the exception of Varley, Plaintiffs' declarations also reasonably support the inference that they did not actually suspect that Defendants' contamination was the cause of their injury. Plaintiff Varley's declaration, on the other hand, shows that he actually suspected that the contamination was the cause of his lymphoma. Varley states,

> Following my diagnosis, I remembered rumors I had heard over the years that Defendants' [sic] had been using hazardous substances in their operations at the [SSFL]. In May 1989, I also read an article about the Department of Energy report about the SSFL. However, the Survey only raised questions because it said that the monitoring system at SSFL was inadequate to determine nature and extent of contamination.... I had no information or evidence linking

**23.** It appears that no effort was made on part of Plaintiffs' counsel to either amend or supplement the complaint to assert a wrongful death claim. Moreover, the estate representative does not declare that the death resulted from Defendants' conduct. The Court, therefore, assumes that Bleecker's estate does not

believe that Defendants' contamination caused his death.

Additionally, Defendants do not contend that Bleecker's personal injury claim was extinguished by his death. Accordingly, the Court assumes that Bleecker's estate could continue to pursue his personal injury claim.

the Defendants' activities to my lymphoma.

(Varley Decl. ¶ 5.) Moreover, in 1989, Varley filed a complaint against Defendants alleging that Defendants' contamination caused his lymphoma. He withdrew that complaint "because [he] did not believe [he] had enough evidence to pursue a claim at that time." (*Id.* at ¶ 12.) Only upon joining this lawsuit, did Varley believe that he "had sufficient factual information to proceed with a suit." (*Id.* at ¶ 13.)

Accrual of an action, however, does not depend on when a plaintiff has the evidence to proceed on a claim. Indeed, that theory was expressly rejected by *Jolly:*

A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; *that is a process contemplated by pretrial discovery.* Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights.

*Jolly,* 44 Cal.3d at 1111, 245 Cal.Rptr. 658, 751 P.2d 923 (emphasis added). In Varley's case, the evidence shows that he suspected that his lymphoma was caused by Defendants' contamination as early as 1989. Thus, the limitations period on his claim ran out some time in 1990.[24]

The Court therefore GRANTS Defendants' motion as to the personal injury claims asserted by Plaintiffs Bleecker, Davis, and Varley.

### b. How and when the claim was discovered.

Plaintiffs must also present evidence of when and how they discovered their claims. *McKelvey,* 74 Cal.App.4th at 160, n. 11, 86 Cal.Rptr.2d 645. Again, the issue in this case involves when and how Plaintiffs discovered that Defendants' contamination caused their respective illnesses.

Each of the remaining Plaintiffs filed a declaration explaining the manner in which they discovered that Defendants' contamination might be the cause of their injury. Except for the representative for the estate of Trench, no Plaintiff declares that he or she first learned of Defendants' conduct through the release of the UCLA study in September 1997. Thus, each and every Plaintiff except one contradicts the statements made in the FoAC.

The FoAC states: "[Plaintiffs] did not discover the actual cause of the injuries upon which they premise their claims in this action until on or about September 11, 1997, the date of the public release of the UCLA Study...." (FoAC ¶ 189.) The contradictory declarations, if accepted, would create a genuine issue of fact as to when each Plaintiff learned of the cause of his or her injury. The issue is whether the Court must disregard the Plaintiffs' contradictory declarations.

"[A] statement in a complaint may serve as a judicial admission." *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848 (9th Cir. 1995). Judicial admissions "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988). "Where, however, the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight." *Sicor,* 51 F.3d at 859–60. However, where a plaintiff fails to provide a credible explanation for its "error," the Court can disregard the contradictory evidence. *See Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.,* 995 F.Supp. 1060, 1065–66 (D.Ariz. 1997).[25]

Here, Plaintiffs attempt to explain their "error" by asserting that

---

**24.** The Court notes that Plaintiffs also argue that the statute of limitations is tolled by the fraudulent concealment doctrine. (*See* Pls.' Opp. at 28–31; FoAC ¶ 190.) The Court finds, however, that Plaintiffs' evidence is wholly deficient to establish fraudulent concealment.

**25.** In addressing this issue, Defendants cite to an unpublished Ninth Circuit authority. (*See* Defs.' Reply at 7.) The Court, of course, gives no weight to that case. *See* 9th Cir.R. 36–3.

there is simply nothing inconsistent with the allegation in the [FoAC] that such Plaintiffs 'did not discover the *actual cause of the injuries* upon which they premise their claims in this action until on or about September 11, 1997' and the assertion that Plaintiffs did not *discover their claims* until shortly before filing their complaint.... [A] group of plaintiffs filed suit before knowing the *actual cause* of their injuries.... However, there is nothing wrong with the fact that this group of Plaintiffs did so, nor does it render the allegations in the [FoAC] regarding the date of discovery 'a sham.' (Pls.' Opp. at 46–47 (emphasis in original).) The Court finds Plaintiffs' explanation ludicrous. First, as Plaintiffs allege, the UCLA Study "concluded that *workers* at the [SSFL] have an increased risk of cancer as a result of their exposure to radiation at the facility." (FoAC ¶ 181 (emphasis added).) Thus, the UCLA Study did not actually address any link between off-site contamination and illness and disease in the neighborhood. Second, the FoAC was filed in response to a Court order directing that Plaintiffs plead their discovery of Defendants' tortious conduct. (March 9, 1998 Order at 34.) Thus, at best, it appears that Plaintiffs merely ignored the Court's directive to specifically plead discovery of Defendants' tortious conduct or, at worst, expediently pled an apparently valid basis without confirming the factual validity of the allegation. Third and finally, Plaintiffs' explanation that their discovery of the "actual" cause differs from discovery of their claims is in direct conflict with the standard that has been enunciated time and time again by the California Supreme Court. *See, e.g, Norgart,* 21 Cal.4th at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79 (stating that discovery of claim is based on knowledge *or suspicion* of injury *and cause* ). Plaintiffs will be bound to their judicial admission.

All the Plaintiffs are deemed to declare that they discovered their claims on September 11, 1997. However, such an explanation fails to show how and when a claim filed *prior to that date* was discovered. Thus, those Plaintiffs who filed their claim before September 1997 have failed to meet their burden of providing evidence of when and how they discovered their claims. Accordingly, the Court GRANTS Defendants' motion as to the following Plaintiffs, who filed their claims before September 1997: F. Arnold, L. Arnold, Anzilotti, Blaustein, Bolster, Bryant, Cady, Cass, Chappell, Crilley, Felkins, R. Grandinetti, Gross, Hecker, Hemming, King, Kirby, Lee, Pasquini, Peyton, Pitts, Rubin, Rueger, Sablow, Spero, D. Stone, J. Stone, Strausburg, J. Teicher, M. Teicher, Tremonti, Jr., Wollman, and the estate of Barina.[26]

As to the Plaintiffs who filed the claim after the UCLA study was published, the Court finds that they have presented sufficient evidence of when and how they discovered their claim. Whether the Court relies on the allegation in the FoAC or the declarations submitted by these Plaintiffs, the evidence supports a conclusion that the discovery of their claims occurred within the one-year limitations period.

### c. Lack of means of obtaining knowledge.

Plaintiffs must also present evidence that they lacked the means of obtaining knowledge. *McKelvey,* 74 Cal.App.4th at 161, n. 11, 86 Cal.Rptr.2d 645. This element is closely tied to the fact that a "plaintiff is held to ... knowledge that could reasonably be discovered through investigation of sources open to her." *Jolly,* 44 Cal.3d at 1109, 245 Cal.Rptr. 658, 751 P.2d 923.

Defendants assert that more than a year before the filing of this case, a plethora of media coverage, public and regulatory meetings, and case filings had addressed the Rocketdyne facilities' pollution. Additionally, more than year before the filing of

---

**26.** The Court notes that all of these Plaintiffs, with the exception of Plaintiffs Bryant, Cass, Gross, Hemming, and Kirby, would in any event have been imputed with knowledge of their respective claims outside the limitations period.

this case, Defendants conducted an outreach effort to the neighboring communities that disclosed the Rocketdyne facilities' possible pollution problems. Thus, all the Plaintiffs should be imputed with knowledge of that contamination and the alleged causal link to their injuries at a time that would bar their present claims.

Plaintiffs counter that publicity, previous cases, official meetings, and Defendants' own outreach effort are not enough. According to Plaintiffs, the evidence must also show that Plaintiffs actually saw the publicity, knew of the previous cases, attended the special meetings, or received Defendants' publicity. The Court agrees that publicity is not enough; however, Plaintiff's theory goes too far.

As a threshold matter, the Court believes that the parties have collapsed a two-part inquiry into one part. The first step requires identifying the knowledge that can be imputed to Plaintiffs. The second step requires determining whether a reasonable person with that imputed knowledge would suspect that Defendants' contamination was the cause of his or her injury. *Cf. Mangini v. Aerojet–General Corp.*, 230 Cal.App.3d 1125, 1152–53, 281 Cal.Rptr. 827 (1991) (determining what information plaintiff knew and then evaluating whether that knowledge should have made plaintiff suspicious).

Defendants' position implicitly concedes that the mere fact of injury would be insufficient for a finding that a reasonable person would suspect that Defendants' contamination was the cause of that injury. Indeed, "[t]here are many suspected causes of cancer, many of which are natural or non-negligent and would not give rise to a legal cause of action." *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1385 (10th Cir.1985). "Thus, a potential plain-

tiff, on learning that he has cancer, lacks the usual incentive to investigate the possibility that the known injury may give rise to a legal claim." *Id.* Similarly, the mere fact of injury *and* knowledge of the existence of Rocketdyne facilities and that the facilities handled nuclear and toxic materials would be insufficient for the Court to conclude, at this stage, that a reasonable person would suspect that Defendants' contamination was the cause of their injury. Thus, unless the Court imputes knowledge of at least some of the material presented by Defendants, Defendants cannot succeed on their motion.

### 1) *Actual knowledge of information.*

Almost all remaining Plaintiffs indicate that they were unaware of any of the information identified by Defendants. None of the Plaintiffs admit to knowing of the repositories, attending any meeting where Rocketdyne's pollution was discussed, or learning about other lawsuits outside of the limitations periods. However, Plaintiffs Creinin and Highfield state that they were aware of the 1991 study published by the Department of Health Services more than a year before filing their claims.[27] (*See* Creinin Decl. ¶ 14; Highfield Decl. ¶ 13)

### 2) *Standard for imputing knowledge of information.*

As Defendants point out, various cases have imputed knowledge from publicity. *See, e.g., McKelvey*, 74 Cal.App.4th at 161, 86 Cal.Rptr.2d 645; *United Klans of America v. McGovern*, 621 F.2d 152, 154 (5th Cir.1980); *Stutz Motor Car of America, Inc. v. Reebok International, Ltd.*, 909 F.Supp. 1353, 1360–62 (C.D.Cal.1995). At the same time, as Plaintiffs point out, other cases have refused to impute knowledge based on publicity.[28] *See Bibeau v. Pacific*

27. Plaintiffs King, Lee, and M. Teicher also were aware of the DHS study. (King Decl. ¶ 13; Lee Decl. ¶ 13; M. Teicher Decl. ¶ 12.) Additionally, Plaintiffs Lee and Peyton state that they "may have seen or heard some of" the media articles regarding hazardous materials more than a year before filing their

claims. (Lee Decl. ¶ 10; Peyton Decl. ¶ 10.) All these Plaintiffs filed their respective claims before the UCLA study was released.

28. Plaintiffs attempt to distinguish most of the cases cited by Defendants by describing the courts' imputation of knowledge as dictum

*Northwest Research Foundation, Corp.,* 188 F.3d 1105, 1110 (9th Cir.1999).

 Where publicity and information concerning an issue is generally available, the Court may impute knowledge of that information to a plaintiff. The mere fact of publicity, however, does not conclusively show that a plaintiff must be imputed with knowledge. Where the existence of publicity is shown, however, a plaintiff must explain how in the exercise of reasonable diligence, he or she managed not to learn about that publicity. *See McKelvey,* 74 Cal.App.4th at 161, 86 Cal.Rptr.2d 645 (imputing knowledge because plaintiffs "fail[ed] to explain how they managed to ignore those 'newspaper articles' "); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975) (imputing knowledge where plaintiff failed to explain how it did not know about publicity and hearings).

Thus, Defendants' position that the extent of publicity establishes constructive knowledge as a matter of law is unavailing. (*See* Defs.' Mot. at 13; Defs.' Reply at 2–5.) As support of its position, Defendants rely substantially on *McKelvey.* *McKelvey,* however, does not hold that mere publicity can establish constructive knowledge. Instead, *McKelvey* relies on the existence of newspaper articles and media broadcasts *and* the plaintiffs' inability to (1) explain how they failed to see those articles or (2) state that they did not read, hear, or see the articles and broadcasts at issue. *McKelvey,* 74 Cal.App.4th at 161, 86 Cal.Rptr.2d 645. Thus, *McKelvey* does not require or support the imputation of knowledge from the mere existence of publicity.

At the other extreme, Plaintiffs' argument that knowledge cannot be imputed unless the evidence shows that a particular Plaintiff actually saw the publicity is also unavailing. Indeed, if a plaintiff actually saw or read an article, he or she would have actual knowledge of the article and the question of constructive knowledge

would be moot. Thus, to impute knowledge of information, a trier of fact need not find that the plaintiff actually was exposed to the information; instead, the trier of fact only needs to find that a *reasonable* person would have discovered that information.

The determination of whether a reasonable person would have discovered the information depends on various factors. The quality and quantity of the information or publicity is one factor. *See Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1123 (9th Cir.1994) (holding that imputing knowledge was not appropriate where article and other lawsuits "were neither numerous nor notorious enough"). Additionally, the characteristics of the Plaintiff should also be considered. *See Stutz Motor Car,* 909 F.Supp. at 1362 (imputing knowledge of widely publicized shoe sale campaign where defendants were involved in footwear industry); *In re Burbank Environmental Litigation,* 42 F.Supp.2d 976, 982 (C.D.Cal.1998) (imputing knowledge of widespread news reports of environmental contamination where neighbors were concerned about contamination and its effects at the time of the publicity and subscribed to the papers printing the reports); *Bibeau v. Pacific Northwest Research Foundation Corp.,* 188 F.3d 1105, 1110 (9th Cir.1999) (refusing to impute knowledge of widespread publicity because reasonable person in plaintiffs' shoes might not have known about publicity); *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1170 (5th Cir.1979) (imputing knowledge of publicity that was widely circulated in beef industry publications where plaintiffs were involved in industry).

### 3) *Imputed knowledge of information for failing to explain unavailability of information.*

Most Plaintiffs explain that they did not attend any meetings at which the Rocketdyne facilities were discussed, regularly

because they all acknowledged that their respective plaintiffs had actual notice. The

Court refuses to accept such a facile explanation.

read or subscribe to papers which discussed the Rocketdyne facilities, or participate in any of the various activities identified by Defendants. However, there are some exceptions.

### a) Subscription and readership of newspapers.

Plaintiff Brucato has subscribed to the *Los Angeles Times*, the *Daily News*, and the *Simi Valley Enterprise* for the last ten years. (Brucato Decl. ¶ 7.) Plaintiffs Creinin and Soifer have subscribed to the *Los Angeles Times* and the *Daily News* for the last ten years. (Creinin Decl. ¶ 7; Soifer Decl. ¶ 6.) Plaintiff Rosen has subscribed to the *Los Angeles Times* for the last ten years. (Rosen Decl. ¶ 7.) Reed [29] has also subscribed to the *Los Angeles Times* over the last ten years, but only intermittently. (Reed Decl. ¶ 7). Plaintiff Seth–Hunter has subscribed to the *Daily News* for the last ten years.[30] (Seth–Hunter Decl. ¶ 7.)

Plaintiffs argue that even those Plaintiffs who admittedly had access to these newspapers cannot be imputed with knowledge of the publicity because the publicity was "not front page news like Chernobyl or Three Mile Island; it was buried on page B–3." (Pls.' Opp. at 15.) Indeed, the quality and quantity of the publicity is relevant to the question of whether knowledge of that publicity can be imputed upon an individual. *See Hopkins*, 33 F.3d at 1123. This publicity, however, is not like that in *Hopkins* where only one relevant article appeared in an obscure medical journal. *Id.* Nevertheless, the Court's review of the publicity shows a wide disparity in the coverage among the various newspapers.

For instance, the *Los Angeles Times* coverage can aptly be characterized as buried on page B–3. The articles on SSFL contamination were neither on the front page of the paper nor even on the front page of the Valley or Metro sections. As

such, the Court finds that there is a genuine issue as to whether a person exercising reasonable diligence would have read and seen the articles in the *Los Angeles Times*. *Cf. Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 503 (9th Cir. 1988) (minimizing *Wall Street Journal* article where defendant failed to identify page on which it ran).

However, the *Daily News'* coverage of the Rocketdyne facilities was on the front page and the reports were sufficiently numerous that a reasonable person who regularly read or received the *Daily News* could not have avoided knowing of the articles. *Cf. Burbank Environmental*, 42 F.Supp.2d at 981 (considering fact that plaintiffs subscribed to papers that reported contamination as factor in imputing knowledge of articles). Even more notorious and numerous was the coverage provided by the smaller Valley Papers and Ventura Papers. Indeed, those papers carried numerous front-page and top story headlines concerning the pollution emanating from the Rocketdyne facilities.

Plaintiffs also argue that Plaintiffs cannot be imputed with knowledge of the Rocketdyne articles because different people focus on different parts of the paper. Initially, the Court notes that most of the Plaintiffs who admit to reading the paper do not present any evidence of the sections of the paper on which they focus. However, such evidence makes no difference. The issue is encompassed in the Court's determination that the articles are numerous and notorious. Indeed, where a Court imputes knowledge, it necessarily implies that the plaintiff did not actually read or see the article. A plaintiff is imputed with knowledge because a reasonable, prudent subscriber of the paper would be unable to escape seeing articles that are numerous and notorious. In this case, the articles are front-page articles printed consistently from May 1989 until at least the end of 1991. Thus, the Court finds that a reason-

---

**29.** Representative for the estate of Reed.

**30.** L. Barina, the representative for the estate of E. Barina, subscribed to the *Daily News* "many years ago." (Barina Decl. ¶ 7.) The estate of Barina filed its claim before the publication of the UCLA study.

able person who subscribed to or regularly read the *Daily News* or the Valley Papers could not have avoided seeing the articles on the Rocketdyne facilities. The readers and subscribers of those papers will therefore be imputed with knowledge of those articles.

Additionally, because Plaintiffs have the burden of showing how they missed the publicity, Plaintiffs must show that they did not subscribe to or regularly read the *Daily News* or the Valley Papers.[31] Plaintiff Orban and L. Hudson, the representative for the estate of B. Hudson, fail to show that they did not subscribe to the *Daily News.* (Hudson Decl. ¶ 7; Orban Decl. ¶ 7.) Therefore, these Plaintiffs are deemed to be subscribers of the *Daily News.*[32] The following Plaintiffs fail to show that they did not regularly read the *Daily News* or the Valley Papers: Orban,

Wernke, White, Tremonti,[33] and Trevino.[34] These Plaintiffs are deemed to be readers of at least the *Daily News* or one of the Valley Papers.[35] Trevino, however, is deemed to be a reader only until September 1989.

### b) Membership in community groups.

Gerard[36] states that he is not a member of various community groups, (Gerard Decl. ¶¶ 19 & 20), but he expressly leaves out the CBG.[37] Thus, the Court imputes him with knowledge of the CBG and its activities.[38]

### c) Defendants' outreach effort.

All the remaining Plaintiffs stated that they never received any of Defendants' informational mailings. Thus, they will not be imputed with knowledge of Defendants' outreach effort.[39]

**31.** The Court notes that the standard declaration submitted by Plaintiffs expressly stated, "I do not subscribe to or regularly read...." (*See, e.g.,* Gerard Decl. ¶ 8.) Some of these declarations, however, left out certain newspapers. (*Compare* Zakarian Decl. ¶ 8 (16 papers listed) *with* Bolster Decl. ¶ 7 (14 papers listed).) Similarly, some only state "I do not subscribe to ..." and leave out the "or regularly read" language. (*See, e.g.,* Trevino Decl. ¶ 7.) In light of these differences among the declarations, the Court finds that a Plaintiff fails to explain how he or she lacks knowledge of a paper's articles if that Plaintiff fails to expressly state that he or she does not subscribe to *or* regularly read a paper. *See McKelvey,* 74 Cal.App.4th at 161, 86 Cal. Rptr.2d 645 (deeming plaintiffs' failure to allege that they did not read or see news articles as knowledge of that publicity).

**32.** The following Plaintiffs who filed their claims before the UCLA study would also be deemed to be subscribers of the *Daily News:* L. Arnold, Bolster, Crilley, R. Grandinetti, Hecker, Lee, Pasquini, Peyton, Pitts, Rubin, Sablow, D. Stone, and J. Stone.

**33.** Representative for the estate of Tremonti.

**34.** Trevino is the representative for the estate of Trevino. She presents evidence that she did not live in the San Fernando Valley anytime after September 1989. (Sears Decl.Ex. 29 at 5088). As described later, *see infra* note 45, a genuine issue of fact exists as to whether she regularly read the papers after this date.

**35.** The following Plaintiffs who filed their claims before the UCLA study would also be deemed to be readers of at least one of those papers: Spero, Strausburg, J. Teicher, M. Teicher, Tremonti, Jr., and Wollman.

**36.** Representative for the estate of Hudlett.

**37.** Every other Plaintiff expressly states that they "never have been a member, or attended any meetings of the [CBG]." (*See, e.g.,* Felkins Decl. ¶ 18.)

**38.** Plaintiff Felkins, who filed his claim before the release of the UCLA study, states that she is not a member of various community groups, (Felkins Decl. ¶¶ 19 & 20), but expressly leaves out the Santa Susana Knolls Homeowners' Association. Every other Plaintiff expressly mentions the Santa Susana Homeowners Association. (*See, e.g.,* Anzilotti Decl. ¶ 17.) Thus, the Court would have imputed Felkins with knowledge of that homeowner association's meetings.

**39.** Unlike these remaining Plaintiffs, Plaintiffs Peyton, D. Stone, and J. Stone omit from their declarations the following sentences: (1) "I never received any notice of Rocketdyne-sponsored community informational meetings, and never have attended any such meetings" and (2) "I am not aware that I am on any Rocketdyne mailing list to whom Rocketdyne regularly sends information about clean-up activities, and I have received no such

#### 4) Imputed knowledge of information.

Defendants argue that even those Plaintiffs who explain their lack of actual means of obtaining information should, nevertheless, be imputed with knowledge of that information. They assert that everyone is imputed with knowledge of public records and that "Plaintiffs were subjected to a constant and unavoidable barrage of highly visible publicity." (Defs.' Mot. at 44.)

##### a) Public meetings and court filings.

■ Defendants' argument that everyone is imputed with knowledge of public records is unavailing. Defendants seek to draw support for their proposition from cases that address the fraudulent concealment doctrine. *See, e.g. United Klans of America v. McGovern*, 621 F.2d 152 (5th Cir.1980); *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir.1979); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir.1975). "When the claim is one of [fraudulent] concealment," as opposed to the discovery rule, "and the very facts allegedly concealed are available in public records, the argument that the plaintiffs should, as a matter of law, be held to constructive knowledge of their cause of action is much stronger." *Maughan*, 758 F.2d at 1388. After all, it would be paradoxical to find that a defendant fraudulently concealed information that was at the same time publicly available. Additionally, the Ninth Circuit has found that the mere availability of information in public records does not result in imputed knowledge of that information. *Bibeau v. Pacific Northwest Research Foundation Inc.*, 188 F.3d 1105, 1111 (9th Cir.1999); *Conmar*, 858 F.2d at 503–04. In light of the Ninth Circuit cases and the reasoning evidenced in *Maughan*, the Court refuses to import the imputed knowledge standards of the fraudulent

concealment doctrine into the discovery rule.

Moreover, the Court finds that it would be unreasonable to impute knowledge of the filing of a complaint *and the contents of that complaint* merely because the complaint was filed. *See Conmar*, 858 F.2d at 503–04 (refusing to impute knowledge of indictment where there was no evidence of news coverage). Assuming that such a rule would be limited to civil filings in one's county, a resident of Los Angeles County would need to be imputed with the knowledge of the content of over 40,000 federal complaints just in the last four years, without accounting for the civil filings in the state court system.[40] Defendants would also have the Court impute knowledge of court filings, governmental hearings, and community meetings throughout Ventura and Los Angeles County. The Court wonders how, after scouring the records of at least three courthouses, attending the meetings and hearings of at least four elected bodies, various administrative agencies, and numerous community groups, and reviewing over 42 linear feet of documents at the public repositories created by Defendants, a reasonably prudent person would have time for his work, family, and health. The Ninth Circuit has stated:

> It would stretch the rule that individuals are presumed to know their legal obligations to the breaking point to presume that they are aware of every report, white paper, and floor statement delivered within the halls of the legislature. The legislative report, like the 1987 Oregon legislation, may have given [plaintiff] actual notice, in which case he would be barred. But [plaintiff] claims that he was unaware of either, and therefore his state of awareness is a contested question of fact that cannot be resolved on summary judgment.

information." (*Compare* Lee Decl. ¶¶ 18 & 19.) Accordingly, had they not filed their claims before the release of the UCLA Study, they would have been imputed with knowledge of the meetings and of the informational mailings.

**40.** The Court notes that this number may actually be slightly smaller because the Central District encompasses more than just Los Angeles County. However, the Court does note that Defendants point to state court cases filed outside of Los Angeles County.

*Bibeau,* 188 F.3d at 1111. The Ninth Circuit's statement applies equally well here. It would stretch the rule of constructive notice to a breaking point to presume that a reasonable person would be so omniscient as to know all the information identified by Defendants. Without more the Court cannot impute knowledge of this type of information.

Although Defendants assert that many of these activities were widely publicized, they do not point to any specific evidence of that publicity. Accordingly, the Court finds that knowledge of court filings, governmental and non-governmental meetings, and of the materials distributed therein cannot be imputed to Plaintiffs.[41]

### b) Newspaper Articles.

The Court has found that the newspapers reports in the Valley Papers and the *Daily News* concerning the contamination from the Rocketdyne facilities were numerous and notorious enough so that anyone that subscribed to or regularly read those papers would be imputed with knowledge of those articles. Many of the Plaintiffs, however, declare that they have not subscribed to or regularly read the *Daily News* or the Valley Papers. That, however, does not preclude the Court from finding that they should have known about the articles. The test is whether a person using reasonable diligence could not have discovered the information. A person exercising reasonable diligence would learn of notorious news.

Plaintiffs argue that they should not be imputed with knowledge of the Rocketdyne facilities news because most of the news was reported in minor newspapers. (*See* Pls.' Opp. at 15.) Most of the Valley Papers have a circulation of less than 25,000, with one having a circulation of 40,000. In Southern California, these are relatively small papers. If these were the only papers which reported on the Rocketdyne facilities, there might be a question as to the notoriety of the news items. However, the Rocketdyne facilities were also covered in the *Los Angeles Times* and substantially in the *Daily News.* Both of these papers have a large circulation in the San Fernando Valley. Moreover, the coverage provided by the *Daily News* was sufficient to establish that a reasonable person exercising diligence would be unable to miss coverage of the Rocketdyne facilities.

■■■ The events surrounding the May 1989 release of the DOE report show the effect that the *Daily News* coverage had on dissemination of that story. The *Daily News* ran a front-page article almost daily about the Rocketdyne facilities and the DOE report during the last two weeks of May 1989. The *Daily News'* aggressive coverage of the issue probably led the local Valley and Ventura Papers as well as the *Los Angeles Times* to also provide substantial coverage of the issue. The news coverage resulted in local government officials and community organizations addressing the issues raised by the news coverage. These community responses, in turn, generated more news coverage. In such an environment, a reasonably diligent person could not help but hearing about the issue, even if that person could not or did not read the actual newspapers. *See Carey v. Kerr–McGee Chemical Corp.,* 999 F.Supp. 1109, 1111–13, 1117 (N.D.Ill.1998) (holding that a reasonable person could not avoid learning of defendant's contamination where local media reports were so widespread that public meetings, governmental investigation, protests, petitions, and lawsuits resulted).

Defendants identify three time periods in which they assert that the news coverage of the Rocketdyne facilities was numerous and notorious.[42] The first one is

---

**41.** With the exception, of course, of Gerard, who was deemed to have participated in CBG.

**42.** Technically, Defendants assert a fourth time period: From 1979–1984. During that time period, Defendants point to various news reports of the 1959 nuclear meltdown and of the nuclear activities at SSFL. Because the Court finds that there is a genuine issue of fact as to whether Plaintiffs should have sus-

late May 1989, when the local newspaper media reported the release of the DOE report. The Court finds that this news coverage was so substantial that a reasonable person could not have avoided learning about the DOE report.

The second period is early February 1991, when the local newspapers covered the dissemination of the DHS study. The *Daily News* ran two front-page articles, the *Los Angeles Times* ran four smaller articles, and the Valley Papers ran six articles. The coverage was not nearly as substantial as the coverage in May 1989. Indeed, the Court finds that there is a genuine issue of fact whether the February 1991 coverage, standing alone, was substantial enough so that a reasonably diligent person would have seen or heard about it.

The third period is August 1991, when the local newspapers covered the discovery of off-site contamination. However, in comparison to the DHS study coverage, the off-site contamination coverage consisted of fewer articles over a longer period of time. Again, by itself, this evidence does not establish that a reasonably diligent person would have seen the coverage. Nevertheless, the Court is convinced that a reasonably diligent person, living in the area for a substantial period of time between June 1989 and September 1991, could not have missed coverage of the SSFL's pollution problems.

Plaintiffs also appear to argue that, even if the publicity was notorious in the community, many of the Plaintiffs cannot be imputed with knowledge of that publicity because they have not lived in the community within the last eleven years. (Facts at p. 31.) The Court agrees. A news item is widely publicized only in connection with a geographic area or population. *See Carey,* 999 F.Supp. at 1117 (stating that media coverage was pervasive in West Chicago community); *Bibeau,* 188 F.3d at 1110 (stating that long-haul trucker may have

missed widespread publicity because he may have been outside the community at the time); *cf. Maughan,* 758 F.2d at 1386 (stating that fact that some plaintiffs had moved out of contaminated area before being diagnosed with cancer complicated the issue of the tolling of the limitations period).

Here, there is no evidence that the Rocketdyne facilities' contamination was widely publicized throughout the United States, or even throughout California. Indeed, based on the evidence presented, the Court does not believe that it could find that the news coverage was numerous and notorious within the whole of Los Angeles County.

Plaintiffs assert that a reasonable person who lived farther than six miles away from the Rocketdyne facilities would not have learned of the news coverage of the contamination. In choosing the six-mile radius, Plaintiffs appear to rely on *Cook v. Rockwell International Corp.,* 755 F.Supp. 1468, 1483 (D.Colo.1991). In *Cook,* the court found that because some plaintiffs lived as far as six miles away from the source of pollution, "[t]he record [did] not establish when plaintiffs knew or should have known that hazardous substances ... reached their property." *Id.* at 1483. The *Cook* court, however, appears to have been concerned with two issues: (1) the defendants' lack of evidence as to when plaintiffs had actually suffered the injury, which would have established accrual under the traditional rule; and (2) whether plaintiffs would have suspected that defendant's pollution had actually reached their property in light of how far they lived from the pollution source. *See Cook v. Rockwell International Corp.,* 181 F.R.D. 473, 484 (D.Colo.1998) (finding that the defendant had failed to satisfy burden of proving injury outside the limitations period and stating that reasonable person may not have made connection between possible in-

pected the cause of their injury even if they had known about these news reports, *see infra,* the Court does not address whether

knowledge of these reports can actually be imputed to Plaintiffs.

jury and publicly available information). Thus, *Cook*'s mention of the six-mile radius was made in connection with the traditional rule of accrual and whether a reasonable person should suspect an injury. The six-mile radius had nothing to do with determining whether plaintiffs should have been imputed with knowledge of media accounts. Moreover, the Court fails to discern a reason to use a radius that, for this case, would be arbitrary and meaningless.

In this case, the evidence shows that the *Daily News'* circulation is concentrated in the San Fernando and Simi Valleys. (*See* Circle Decl. ¶ 4.) Thus, the Court imputes those Plaintiffs who lived in the San Fernando Valley[43] in May 1989 with knowledge of the news coverage of the DOE Report. Additionally, those Plaintiffs who lived in the San Fernando Valley for a substantial period of time between June 1989 and September 1991 are imputed with knowledge of contamination problems at SSFL.

Plaintiff Diamond lived in Burbank from 1978 to 1995. (Sears Decl. Ex 29 at 5085.) A genuine issue of fact exists as to whether the *Daily News* has a substantial readership in Burbank. Plaintiff Extract lived in Santa Barbara County from 1987 to 1992. (*Id.*) Again, a genuine issue of fact exists as to whether the *Daily News* has a substantial readership in Santa Barbara County.

Plaintiff Getter has lived in Arizona since 1973 and moved out of Simi Valley in the late 1960's. (*Id.;* Getter Decl. ¶ 6.) Plaintiff Hultgren has not lived in the San Fernando Valley since before 1989. (Sears Decl. Ex 29 at 5086.) Plaintiffs Lev

and Smith have lived in Arizona since 1984. (*Id.* at 5086–87; Smith Decl. ¶ 7.) Spilkoman[44] lived in Northern California from 1974 to 1996.[45] (Sears Decl. Ex 29 at 5088.)

Finally, Plaintiff Zakarian lived in the San Fernando Valley from 1991 to 1992. (Sear Decl Ex. 29 at 5088.) A genuine issue of fact exists as to whether a reasonable person in Zakarian's shoes would have learned about the media coverage of the Rocketdyne facilities.

Accordingly, the Court finds that the following Plaintiffs have met their burden of showing that they may not have had the means to learn of the publicity and materials upon which Defendants rely: Diamond, Extract, Getter, Hultgren, Lev, Smith, the estate of Trench, and Zakarian. Accordingly, as to these Plaintiffs, Defendants' motion is DENIED.

Even though the following personal injury Plaintiffs have explained that they did not subscribe to or regularly read the *Daily News* or the Valley Papers, the Court imputes knowledge of the identified media coverage to them: Fischman, Highfield, Hintz, Mann, Rosen, and Trench.[46]

As for the wrongful death Plaintiffs, with the exception of the estate of Trench and Trevino, no evidence is presented that the estate representative did not live in the San Fernando Valley from 1989 to 1992. Because a wrongful death action is brought by a decedent's estate or heirs, *Larcher v. Wanless,* 18 Cal.3d 646, 656–57, 135 Cal.Rptr. 75, 557 P.2d 507 (1976), the Court imputes those Plaintiffs with knowledge of the identified media coverage. These are the Plaintiff–Estates of Camer-

---

**43.** In this regard, the San Fernando Valley is defined to include Simi Valley. The San Fernando Valley also includes the communities of Sherman Oaks and Thousand Oaks. The Court also notes that the six-mile area described by Plaintiffs is wholly within the San Fernando Valley.

**44.** Representative for the estate of Trench.

**45.** The Court notes that Spilkoman fails to declare that she does not regularly read the *Daily News* or the Valley Papers. Most other

Plaintiffs who filed similar declarations were deemed to be readers of the papers. However, the fact that Spilkoman lives in Northern California creates a genuine issue of fact as to whether she regularly read those papers.

**46.** The following Plaintiffs would have been imputed with knowledge of the media coverage if they had filed their claims after the release of the UCLA study: F. Arnold, Anzilotti, Blaustein, Cady, Chappell, Felkins, and Rueger.

on, Chu, Hudlett, Reed, and Taaffe. Moreover, the representative of the estate of Trevino presents no evidence that she did not live in the San Fernando Valley in May 1989. Accordingly, the Court imputes knowledge of the May 1989 media coverage to the Plaintiff–Estate of Trevino.

### d. Suspicion of cause of injury.

Defendants assert that the information imputed to Plaintiffs put them on notice that Defendants' contamination was the cause of their injury. Plaintiffs counter that the information was insufficient to place Plaintiffs on notice of their claims because the information would not have made a reasonable person suspicious about Defendants' contamination being the cause of their injury.

### 1) Description of imputed knowledge.

The issue, then, is what information is imputed to Plaintiffs. All the remaining Plaintiffs are imputed with knowledge of the media reports of the DOE report. The media reported that the DOE report had concluded that contamination tainted SSFL. Thus, the remaining Plaintiffs are imputed with knowledge, based on the media reports, that there were contamination problems at SSFL.[47]

Some Plaintiffs also had, or were imputed with, knowledge of additional materials. The additional knowledge imputed to these Plaintiffs merely reinforces the Court's result as to the claims of those Plaintiffs. Therefore, the Court will not directly describe that additional imputed knowledge.[48]

### 2) Injured Plaintiffs should have suspected causal link based on contamination at SSFL.

■ Plaintiffs argue that a reasonable person would not suspect that he or she was injured by Defendants because (1) the imputed knowledge concerned contamination only at SSFL; (2) Defendants and the government constantly issued reassurances about the injury; (3) Plaintiffs were deluged with information about other causes of cancer; and (4) some of the Plaintiffs were diagnosed after the majority of the publicity was disclosed.

Plaintiffs' own allegations, however, refute the contention that knowledge of contamination from SSFL would not lead not one to suspect contamination from the other Rocketdyne facilities. Plaintiffs assert that the actual link between all their injuries and Defendants' contamination was provided by the UCLA study. But the UCLA study reported a link between Defendants' employees' health and contamination at *SSFL only*. Thus, Plaintiffs' allegations establish a link between a study discussing SSFL contamination only and all their injuries, even though some of these injuries were caused by contamination from the DeSoto, Canoga, and Hughes facilities, not from SSFL.

Additionally, Plaintiffs do not explain how a reasonable person would (1) "know" that he or she has been exposed to the *Rocketdyne facilities'* contamination from a report about SSFL contamination in 1997, but (2) not suspect such an exposure

---

47. All of the Plaintiffs who filed their claims before the release of the UCLA study also would have been imputed with knowledge of these media reports, except for: Bryant, Cass, Gross, Hemming, King, and Kirby. Plaintiff King, however, did have actual knowledge of the 1991 DHS Study suggesting a possible link between Defendants' contamination and cancer in the community. Thus, she had actual knowledge of information that was similar to the imputed media reports.

48. The Court also finds that the news coverage from 1976 to 1986 would not lead a

reasonable person to suspect that his or her injury was caused by Defendants' contamination. The news coverage at that time concentrated on the 1959 nuclear meltdown at SSFL. A reasonable person would not necessarily suspect that the incident that occurred at least ten years and up to 37 years earlier would be the cause of one's injury. Thus, assuming, without holding, that the publicity was numerous and notorious, the Court finds that a genuine issue of fact exists as to the notice provided by the 1959 meltdown publicity.

from news reports about SSFL contamination in 1991. Accordingly, the Court finds that a reasonable person, who had knowledge of the news reports about SSFL contamination, would suspect that he or she had been exposed to environmental contamination or radiation from at least one of the Rocketdyne facilities.

Moreover, that suspicion would be engendered even in the face of Defendants' alleged continual denials of contamination.[49] *See Mangini v. Aerojet–General Corp.*, 230 Cal.App.3d 1125, 1153, 281 Cal. Rptr. 827 (1991) ("That defendant gave evasive, or even untruthful reasons for the inspection did not relieve plaintiffs of their duty of inquiry once they had sufficient facts to suspect the cause of action"); *Carey*, 999 F.Supp. at 1116 ("The discovery rule does not allow a plaintiff to wait until the defendant admits it has caused plaintiff's damage. That would be a very long wait indeed."). Nor does the mere fact that a "resident[ ] of the area [was] *deluged* with articles regarding *other causes of cancer*," (Pls' Opp. at 16–17), mean that such a resident would be unable to reasonably suspect that Defendants' contamination caused his injury. Indeed, while such a resident may suspect other causes for his or her injury, those other suspicions could not reasonable nullify a suspicion that exposure to toxic and radioactive contamination caused the injury.[50]

Finally, Plaintiffs' argument that someone who was diagnosed after the majority of the publicity would be unable to suspect a causal link is also unavailing. Plaintiffs' argument boils down to the idea that Plaintiffs would not suspect the link because they would have forgotten about their exposure to Defendants' contamination. However, as previously mentioned, a reasonable person would know that exposure to toxic and radioactive elements could cause cancer. Because exposure to toxic and radioactive materials can cause such dire consequences, it would be unreasonable for a person to forget within six years of learning of that exposure that he or she had been exposed to those materials.

Thus, every Plaintiff who has been imputed with knowledge of the publicity should have suspected that his or her injury was caused Defendants' contamination. The following Plaintiffs should have suspected that their injuries were caused by Defendants' contamination on or before September 1991: Brucato, Highfield, Mann, Orban, Seth–Hunter, Soifer, Wernke, and White. The following Plaintiffs should have suspected that their injuries were caused by Defendants' contamination on their date of diagnosis: Creinin, Fischman, Hintz, Rosen, and Trench.

The following decedents' estates should have suspected that the death was caused by Defendants' contamination on or before September 1991: Hudlett, Taaffe, Tremonti, Sr., and Trevino. The following decedents' estate should have suspected that the death was caused by Defendants' contamination on the date of the death: Cameron, Chu, Hudson, and Reed.

All of these dates fall outside the applicable period of limitations. The Court therefore GRANTS Defendants' motion as to the claims of these Plaintiffs.

## C. Class Action Claims.

### 1. Application of the Traditional Rule.

Defendants assert that the Class Claims are barred by the traditional rule. (*See*

---

**49.** The Court notes that Plaintiffs seem to indicate that, at some point, Defendants admitted to at least on-site contamination. (Pls.' Opp. at 3.)

**50.** Additionally, Defendants' cause stands out because it is different than many of the other causes of cancer. Tobacco, pesticides, diesel fuel, peanut butter, nail polish, cellular phones, and radar guns, (*See* Pls.' Opp. at 17) are causes to which one either purposefully exposes oneself or everyone in the population is similarly exposed. The contamination at issue here is thrust by Defendants upon a discrete number of individuals. A reasonable person who is a target of that conduct would be able to distinguish Defendants' cause from other natural or non-negligent causes.

Defs.' Opp. at 11.) Plaintiffs argue that Defendants fail to indicate when any Class member knew or should have known about their claim or to provide any date when the alleged wrongdoing took place or of the injury. (*See* Pls.' Opp. at 33.) Of course, the issue of knowledge has nothing to do with the traditional rule. As to the date that the injury took place, Defendants rely upon Plaintiffs' allegations in the FoAC. Defendants point out that Plaintiffs' claims are based on conduct that allegedly occurred during the last fifty years. None of the conduct identified by Plaintiffs, however, occurred after July 26, 1994. (*See* Facts ¶¶ 12a – 12k.)

Defendants also rely on this Court's March 1998 Order to support their theory that the statute of limitations bars the class claims. In that Order, the Court found that "it appears as if Plaintiffs were aware that they may have been harmed by Defendants' alleged wrongful conduct years ago outside the relevant limitation period." (Order at 34.) The Court continues to find that it appears that Plaintiffs suffered injury outside the applicable limitations period.

Indeed, it appears that Plaintiffs are barred from recovering for most of the allegedly wrongful conduct of Defendants. However, Defendants have failed to satisfy the burden of showing that the Class claims are completely barred.

Defendants point out that Plaintiffs have not identified any injury arising out of any conduct that occurred after July 26, 1994. Because Plaintiffs claim injury from conduct that occurred as far back as the 1950's, it is clear that class members suffered most of their injury outside the applicable limitations period. However, Defendants fail to (1) provide any evidence that Plaintiffs could not have suffered *any* injury within the applicable limitations period or (2) explain how any such injury would, nevertheless, be barred by the limitations period.

**51.** The same shortcomings are apparent in connection with the Class II claims and the

### *a. Class I claims.*

 As with the personal injury claims, the applicable limitations period for the Class I medical monitoring claims is one year. In contrast to the personal injury claims where accrual of the claim is shown by the diagnosis of the illness, the Class I claims for medical monitoring are complete when the class is exposed to the contaminant. *California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1406 (9th Cir.1995) (holding that accrual of action occurs upon wrongdoing *and* actual and appreciable harm). However, that generally will not happen at the same time that a defendant improperly releases or dumps the contaminant. Defendants fail to provide any evidence of when or for how long the Class was actually exposed to the contaminants. As far as the Court knows, the exposure could have occurred hours, or not for years, after the release of the contaminants. Thus, it is possible that some of this exposure happened within the applicable limitations period.

Additionally, the exposure could have occurred within hours of the release of the contamination for some class members and within years for other members. Neither side has addressed how this limitation period should be applied to the Class if different class members are exposed at different times.[51]

### *b. Class II claims.*

 Defendants also have failed to show that the Class II claims are barred. The applicable limitations period for the Class II claims is three years. As with the Class I claims, the property claims accrue not at the time of dumping but at the time that the contaminants reach the property. *Wilshire Westwood Assocs. v. Atlantic Richfield Co.,* 20 Cal.App.4th 732, 739, 24 Cal.Rptr.2d 562 (1993). Again, Defendants fail to provide any proof that Plaintiffs did not suffer *any* injury from

Class III CERCLA claim.

Defendants' conduct within the limitations period. Thus, the Class II claims are not barred to the extent that injury to the property occurred within the limitations period.

Additionally, Plaintiffs allege that Defendants' tortious conduct continued as late as July 24, 1994. Thus, the Class II claims are clearly not barred to the extent that the claims are based on Defendants' conduct between March 10 and July 24, 1994.

#### c. Class III claims.

The Class III CERCLA claim also survives for the same reasons as the Class II claims.

■ The Unfair Business Practices claim, however, is different. First, the claim has a limitations period of four years. Second, the unfair practice is Defendants' conduct of releasing contaminants into the neighborhood. Thus, to the extent that this claim is based on Defendants' conduct that occurred prior to March 10, 1993, it is barred by the statute of limitations. However, to the extent that it is based on conduct occurring after March 10, 1993 and before July 24, 1994, the claim survives.

### 2. Application of the Discovery Rule.

#### a. Class I claims.

The Class I representatives are Plaintiffs H. Samuels and J. Samuels. Both class representatives explain that they were not actually aware of their claim until within a year of joining the lawsuit. (*See* H. Samuels Decl. at ¶ 5.; J. Samuels Decl. ¶ 5.) Additionally, both class representatives joined the lawsuit after the release of the UCLA study. Thus, whether the Court relies on the FoAC allegation or their present declarations, the class representatives have sufficiently explained when and how they learned of their claims.

Although H. Samuels states that he does not subscribe to the *Daily News* or the Valley Papers, he omits any mention of whether he reads those papers. (H. Samuels Decl. ¶ 7.) Thus, as with the personal injury Plaintiffs, he will be deemed to be a reader of those papers. *See supra* p. 1045. J. Samuels does state that she neither subscribes to nor reads the *Daily News* or the Valley Papers. (J. Samuels ¶ 7.) However, because she lives in the San Fernando Valley, she will be imputed with knowledge of the widespread publicity from May 1989 to September 1991. *See supra* pp. 1048–49.

Thus, the class representatives are deemed to know of Defendants' contamination as of 1991. Therefore, the Court finds that the class representatives' claims are barred to the extent that the claims are based on conduct and injuries that occurred in or before 1991. Claims seeking relief for those injuries should have been filed at the latest in 1992.

#### b. Class II and III claims.

The Class II and III representatives are R. Grandinetti, L. O'Connor, M. O'Connor, Reed, Rueger, and Vroman. All of these Plaintiffs filed their claims before the release of the UCLA study. They will, therefore, be held to the FoAC allegation alleging that they discovered their claims in September 1997, after they had filed their claims. *See supra* pp. 1040–41. Accordingly, they have failed to meet their burden of providing evidence of when and how they discovered their claims. *Id.* Thus, they cannot toll the statute of limitations by application of the discovery rule. *See McKelvey,* 74 Cal.App.4th at 160, n. 11, 86 Cal.Rptr.2d 645. The Court finds that the class representatives' claims are barred to the extent that they were injured outside the three-year (or four-year, for unfair practices) limitations period.[52]

Because Defendants have failed to show that *no* injury occurred during the applicable limitations period, the Court DENIES Defendants' motion as to the class claims.

---

**52.** In any event, as to the unfair business practices claim, the discovery rule would not have applied. *See Stutz Motor Car,* 909 F.Supp. at 1363.

## V. Future Proceedings

### A. The Court's Concerns on the Class Claims.

The Court notes that it appears that individual questions concerning both the traditional rule and the discovery rule now predominate over the class-wide legal issues.

Indeed, it appears that the question of when the contamination actually reached a particular individual's property may vary from property to property. This rolling limitations period means that a class member might be entitled to recover for contamination stemming from conduct that occurred from 1980 to 1994 while another class member could recover only for contamination stemming from conduct that occurred in 1994. And that individual variation does not even take into consideration the individual differences that must be addressed under the discovery rule.

Moreover, neither side bothered to address how the Court's determination of the limitations question can be applied to a class as a whole in light of these individual variations. Should the Court look to the class representatives? Should the Court grant the motion because a theoretical one, many, or majority of the class members may be barred? Should the Court deny the motion because a theoretical one, many, or majority of the class members may not be barred? The parties have failed to provide any guidance to the Court on this issue.

The Court is concerned that the requirements of Fed.R.Civ.P. 23(b) no longer apply to the Class II and III property claims. That variation also implicates the typicality requirements of Fed.R.Civ.P. 23(a)(3) for all classes. Additionally, this Order has substantially limited the recovery of the class representatives. The Court, therefore, questions whether the prerequisite of adequate representation under Fed.R.Civ.P. 23(a)(4) continues to be satisfied.

### B. Possible Options.

If Defendants believe that they can prove that no injury was suffered within the periods of limitations and can address the Court's concerns about applying the statute of limitations to these class claims, the Court grants them leave to file another summary judgment motion on the statute of limitations.

However, because the Court is concerned that the individual differences in connection with most of these claims defeat the value of a class action, the Court would also be willing to consider a motion to de-certify the class claims. And, of course, the Court notes that Defendants have filed another motion for summary judgment (the "*Celotex* motion") that has been continued pending the determination of this motion. Unless an option is mooted by a stipulation from Plaintiffs, Defendants must decide how to proceed in this matter.

If Defendants wish to proceed on the *Celotex* motion, the parties should stipulate to a briefing schedule. The Court will not hear that motion any earlier than May 22, 2000.

### VI. Conclusion

The Court DENIES Defendants' Motion as to the Class Action claims.

The Court DENIES Defendants' Motion as to the claims asserted by Plaintiffs Diamond, Extract, Getter, Hellerstein, Hultgren, Lev, L. O'Connor, Reed, Smith, the estate of Trench, Wolfsen, and Zakarian. The Court notes that the motion did not affect the claims of Plaintiffs Aungst, L. Barina, S. Grandinetti, Peleaz, and the estate of Mauck.

The Court GRANTS summary judgment in favor of Defendants on the personal injury claims asserted by Plaintiffs F. Arnold, L. Arnold, Anzillotti, Blaustein, Bleecker, Bolster, Brucato, Bryant, Cady, Cass, Chappell, Creinin, Crilley, Davis, Felkins, Fischman, R. Grandinetti, Gross, Hecker, Hemming, Highfield, Hintz, King, Kirby, Lee, Mann, Orban, Pasquini, Peyton, Pitts, Rosen, Rubin, Rueger, Sablow, Seth–Hunter, Soifer, Spero, D. Stone, J. Stone, Strausburg, J. Teicher, M. Teicher, Tremonti, Jr., Trench, Varley, Wernke,

White, and Wollman. The Court notes that Plaintiff Sadjady previously dismissed her claim.

The Court GRANTS summary judgment in favor of Defendants on the wrongful death claims asserted by Plaintiff Estates of Barina, Cameron, Chu, Hudlett, Hudson, Reed, Taaffe, Tremonti, Sr., and Trevino.

**SO ORDERED.**